IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA

v.

ELEVIEW INTERNATIONAL INC.,

OLEG NAYANDIN, AND

VITALIY BORISENKO

      Defendants.

Case No. 1:24-MJ-439

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Christopher D. Silva, being duly sworn, depose and state:

## INTRODUCTION

1.    This affidavit is submitted in support of a criminal complaint for Eleview International Inc. ("ELEVIEW"), Oleg Nayandin ("NAYANDIN"), and Vitaliy Borisenko ("BORISENKO") (collectively, the "DEFENDANTS") and arrest warrants for NAYANDIN and BORISENKO, for conspiracy to violate the Export Control Reform Act ("ECRA"), 50 U.S.C. §§ 4819(a)(2)(A), (B), (D), (F), and (G), and the Implementation of Sanctions Against Russia Under the Export Administration Regulations (hereinafter the "EAR Russia Sanctions"), 87 Fed. Reg. 12,226 (Mar. 3, 2022), which, *inter alia*, amended the Export Administration Regulations ("EAR"), 15 C.F.R. parts 730-774, to provide for new license requirements for Russia on certain items subjects subject to the EAR, *see* 15 C.F.R. § 746.8.

1

2.      ELEVIEW is a company based in the Eastern District of Virginia.  Among other services, ELEVIEW's freight-forwarding business provides customers in the Russia Federation ("Russia") with a means of purchasing and sending goods from the United States to Russia. NAYANDIN is the owner, CEO, and President of ELEVIEW.  BORISENKO oversees the day-to-day operations of ELEVIEW's freight-forwarding business.  Collectively, the DEFENDANTS have been in the export business for many years, and the investigation has revealed that they were familiar with U.S. export laws.

3.      The EAR Russia Sanctions went into effect on February 24, 2022, in response to Russia's invasion of Ukraine.  As described in more detail below, among other things, the EAR Russia Sanctions require exporters, such as the DEFENDANTS, to obtain a license from the U.S. Department of Commerce before sending certain goods to Russia.  *See* 15 C.F.R. § 746.8.  ECRA prohibits violations of the EAR, including the EAR Russia Sanctions and the license requirements for exports to Russia, as well conspiracies to violate and the aiding and abetting of violations of the EAR.  *See* 50 U.S.C. § 4819(a)(2)(A), (B), and (D).  ECRA also prohibits exporters from making any false or misleading representations, statements, or certification to, or falsifying or concealing any material fact from, the Department of Commerce, or any official of any other United States Agency, either directly or indirectly through another person, in connection with the submission of export control documents or any required filings or in connection with effecting any export of an item subject to the EAR.  *Id.* § 4819(a)(2)(F).  Relatedly, ECRA prohibits exporters from engaging in any transaction or taking any other action with intent to evade the provisions of EAR, including the EAR Russia Sanctions.  *Id.* § 4819(a)(2)(G).

4.      As described in detail below, despite the DEFENDANTS' knowledge of their obligations under ECRA and the EAR Russia Sanctions, the DEFENDANTS have conspired to

violate ECRA and EAR Russia Sanctions, through three similar export-control evasion schemes involving the illegal export of controlled technology from the United States to Russia transshipped through intermediary countries:

5.      **The Turkey Scheme.**  From approximately May 2022 through February 2023, the DEFENDANTS exported nearly $1.5 million worth of telecommunications equipment from the United States to a purported end user in Turkey, with the knowledge and understanding that the telecommunications equipment would be transshipped from Turkey to a major telecommunications company in Russia ("RUSSIAN TELECOM CO.").  The telecommunications equipment included dozens of controlled goods that required licenses for export to Russia, which the DEFENDANTS never obtained.

6.      RUSSIAN TELECOM CO. has been a client of ELEVIEW's for approximately 15 years.  RUSSIAN TELECOM CO. is a major supplier of telecommunications equipment to the Russian government, including Russia's Federal Security Service ("FSB"), the Russian internal security and intelligence agency.  Indeed, the Russian government has historically purchased many of the same types of telecommunications equipment from RUSSIAN TELECOM CO. that the DEFENDANTS illegally shipped to RUSSIAN TELECOM CO. The telecommunications equipment that the DEFENDANTS illegally exported to RUSSIAN TELECOM CO. have an array of potential applications, including use by Russian military to create and expand communication networks to further its war effort in Ukraine.

7.      **The Finland Scheme.**  From approximately March 2022 through June 2023, the DEFENDANTS smuggled over $3.4 million worth of goods from the United States to a purported end user in Finland, with the knowledge and understanding that the goods would be transshipped from Finland to Russia.  The purported end user in Finland was another freight forwarder that

3

neither purchased nor sold goods.  The DEFENDANTS then coordinated with the Finnish freight forwarder and the Russian postal service to transship the goods to the real end users in Russia.

8.      The investigation revealed that, among the goods that the DEFENDANTS exported to Russia through the Finland Scheme, the DEFENDANTS sent multiple shipments with controlled goods.  Notably, the DEFENDANTS smuggled controlled goods that the Department of Commerce's Bureau of Industry and Safety ("BIS") has identified as "high priority" items, meaning that these items are particularly significant to Russian weaponry and have been used to fuel Russia's war machine.  *See* BIS Common High Priority List, https://www.bis.doc.gov/index.php/all-articles/13-policy-guidance/country-guidance/2172-russia-export-controls-list-of-common-high-priority-items (last updated Feb. 23, 2024).  For example, the DEFENDANTS smuggled an Ethernet transceiver subject to the EAR to Russia.  The DEFENDANTS never obtained the required license to export the Ethernet transceiver from the United States to Russia.  The same type of Ethernet transceiver has been found on multiple unmanned aerial vehicles (UAVs) that the Russian military has used as "suicide" drones to destroy valuable Ukrainian tanks and jets.  The investigation revealed that the DEFENDANTS continued to violate export laws by smuggling goods to Russia through Finland, despite explicit warnings from U.S. authorities (including myself) that transshipping goods to Russia through Finland without the required license from BIS was illegal.

9.      ***The Kazakhstan Scheme.***  From approximately March 2022 through June 2023, the DEFENDANTS exported nearly $1.4 million worth of consumer goods, electronics, and telecommunications equipment to purported end users in Kazakhstan, with the knowledge and understanding that these goods would be transshipped to end users in Russia.  Of particular concern, the DEFENDANTS shipped thousands of dollars' worth of controlled goods, many of

which are openly advertised as having military applications, such as military radar, military communications, or military defense systems.  The DEFENDANTS never obtained the required licenses to export these goods from the United States to Russia.

10.     Combined, the investigation has revealed that the DEFENDANTS exported over $6 million worth of goods from the United States into Russia after the EAR Russia Sanctions were implemented on February 24, 2022, including the types of technology and equipment that Russia is using to further its war in Ukraine.  Through these schemes, the DEFENDANTS have committed multiple violations of ECRA and the EAR, including by exporting controlled goods to Russia without the required licenses and by causing false information concerning the end users (*i.e.*, ultimate consignees) of goods to be submitted to the Department of Commerce , despite the fact that the DEFENDANTS knew that the end users were actually located within Russia and intended to ship the goods to end users in Russia.

11.     As a result, there is probable cause to conclude that the DEFENDANTS willfully conspired with each other, and with others known and unknown, to export or cause to be exported, directly or indirectly, from the United States to Russia, items controlled for export to Russia under the EAR, including the EAR Russia Sanctions, without the required licenses, and to engage in transactions that evaded or avoided, or had the purpose of evading or avoiding, the prohibitions contained in the EAR, including prohibitions against the unauthorized exportation of goods from the United States to a third country if the goods are intended or destined for Russia, in violation of 50 U.S.C. §§ 4819(a)(2)(A), (B), (D), (F), and (G).

## AGENT BACKGROUND

12.     I have served as a Special Agent with the United States Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE") since

July 2020 and am currently assigned to the OEE Washington Field Office in Herndon, Virginia.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.  As a Special Agent with OEE, my duties include investigating violations of laws and regulations relating to the export of controlled commodities and technology from the United States, including ECRA and the EAR.  My primary responsibility is investigating crimes involving the export of certain manufactured "dual-use" commodities, that is, commodities that can be used for both commercial and military purposes.  Through my training and experience I am familiar with the export-control laws of the United States and the means and techniques used by individuals and entities that violate and evade these laws.

13.     The information set forth in this affidavit is based on my personal knowledge, that of other law enforcement agents (specifically of the U.S. Department of Homeland Security, Homeland Security Investigations ("HSI")), public records, and other sources as indicated herein. In addition, I have reviewed documents obtained during the investigation.  Since this affidavit is being submitted for the limited purpose of securing the requested warrants, I have not included every fact known to me concerning this investigation.  Rather, I have set forth only those facts relevant and necessary to establish probable cause.

## APPLICABLE CRIMINAL LAW

**I.      THE EXPORT CONTROL REFORM ACT OF 2018.**

14.     On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes a series of provisions on export controls, entitled the Export Control Reform Act of 2018.  In part, ECRA provides permanent statutory authority for the EAR, which are discussed below.

15. ECRA provides, among its stated policy objectives, that "the national security and foreign policy of the United States require that the export, reexport and in-country transfer of items, and specific activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811(2). To that end, ECRA authorizes the President "to control (1) the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or by foreign persons; and (2) the activities of United States persons, wherever located, relating to" specific categories of items and information. *Id.* at § 4812(a). ECRA further authorizes the Secretary of Commerce to establish the applicable regulatory framework.

16. Pursuant to that and prior authority, the DOC reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. In particular, the EAR restricts the export of items that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR impose licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully reexported from one foreign destination to another.

17. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"). 15 C.F.R. part 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number ("ECCN"), an alphanumeric designation, based on their technical characteristics. Each ECCN has export control requirements depending on destination, end user, and end use. Items subject to the EAR but not specifically listed on the CCL are classified as "EAR99." 15 C.F.R. § 734.3(c).

18.     Pursuant to 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this part or of any regulation, order, license, or other authorization issued under this part."

19.     Section 4819(a)(2) of Title 50 provides specific unlawful acts.  Relevant here, the specific unlawful acts include the following:

 a. "No person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder."  *Id.* § 4819(a)(2)(A).

 b. "No person may cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any act prohibited, or the omission of any act required by this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder."  *Id.* § 4819(a)(2)(B).

 c. "No person may conspire or act in concert with one or more other persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of this subchapter, the Export Administration Regulations, or any order, license or authorization issued thereunder."  *Id.* § 4819(a)(2)(D).

 d. "No person may make any false or misleading representation, statement, or certification, or falsify or conceal any material fact, either directly to the Department of Commerce, or an official of any other United States agency, including the Department of Homeland Security and the Department of Justice, or indirectly through any other person— … (ii) in connection with the preparation, submission, issuance, use, or maintenance of any export control

8

document or any report filed or required to be filed pursuant to the Export Administration Regulations; or (iii) for the purpose of or in connection with effecting any export, reexport, or in-country transfer of an item subject to the Export Administration Regulations or a service or other activity of a United States person described in section 4813 of this title." *Id.* § 4819(a)(2)(F).

e. "No person may engage in any transaction or take any other action with intent to evade the provisions of this subchapter, the Export Administration Regulations, or any order, license, or authorization issued thereunder." *Id.* § 4819(a)(2)(G).

20.     Under § 4819(b), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) shall" be guilty of a federal crime that may be punishable by up to 20 years' imprisonment.

## II.     The EAR RUSSIA SANCTIONS.

21.     In response to the Russian Federation's full-scale invasion of Ukraine in February 2022, the DOC BIS issued certain sanctions against Russia that impose export controls and license requirements to protect U.S. national security and foreign policy interests.

22.     On February 24, 2022, BIS issued a final rule, effective that same day, titled "Implementation of Sanctions Against Russia Under the Export Administration Regulations (EAR)," 87 Fed. Reg. 12,226 (Mar. 3, 2022) (the "EAR Russia Sanctions"). These sanctions added new license requirements and licensing policies, including expanded prohibitions on the export, reexport, or in-country transfer of, among other things, telecommunications and information

security equipment to or within Russia without a license, and a general licensing policy of denial (with limited exceptions) for such transactions.

23.     As of April 8, 2022, license requirements for exports, reexports, and transfers to or within Russia were expanded to cover all items on the CCL.  *See* 87 Fed. Reg. 1226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8.

24.     On March 3, 2022, BIS imposed additional license requirements for exports, reexports, and transfers to or within Russia of any items subject to the EAR that were identified under certain Schedule B or Harmonized Tariff Schedule 6 ("HTS") numbers/codes.  *See* 87 Fed. Reg. 12,856 (Mar. 8, 2022); 15 C.F.R. Part 746, Supp. No. 4.  HTS codes take their first six digits from the corresponding Harmonized System ("HS") code, a standardized numerical method of classifying traded products used by customs authorities around the world.

25.     In July 2023, BIS announced a list of "high-priority" items that "pose a heightened risk of being diverted illegally to Russia because of their importance to Russia's war efforts."  The list included four tiers of goods, which were identified by their HTS codes and categorized by their relative degree of criticality.  While BIS published the categories of "high-priority" items in July 2023, these HTS codes were controlled as part of the initial EAR Russia Sanctions rollout in March 2023.

26.     An exporter generally is required to file Electronic Export Information ("EEI") through the Automated Export System ("AES") where, among other reasons, an export license is required, the value of the commodity being exported is more than $2,500, or items on the CCL (regardless of value) are being exported to Russia.  15 C.F.R. § 758.1.  The EEI requires an exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address (if any), and a description of the commodity to be

exported.  Failure to file EEI or providing false or misleading EEI is a violation of ECRA and 13

U.S.C. § 305.  *See* 50 U.S.C. § 4819(a)(2)(F); 13 U.S.C. § 305; 15 C.F.R. part 758; 15 C.F.R. part

758.1(b)(1); 15 C.F.R. part 30.

## PROBABLE CAUSE

**I.   BACKGROUND ON ELEVIEW, NAYANDIN, AND BORISKENO.**

27.    ELEVIEW was incorporated in Delaware in January 1999 and is registered to do

business in Virginia.  ELEVIEW's business generally includes three types of services:  (1)

information technology (IT) and custom software projects; (2) business to business platforms; and

(3) freight consolidation and forwarding.  ELEVIEW's freight consolidation and forwarding

business operates out of a warehouse in Chantilly, Virginia, which is in the Eastern District of

Virginia.    In addition to NAYANDIN and BORISENKO, ELEVIEW has approximately three

employees who work in ELEVIEW's warehouse in Chantilly.

28.    NAYANDIN is the owner, President, and CEO of ELEVIEW.  In that role, he is

charge of ELEVIEW's overall business.  NAYANDIN has been in that role since he started the

company in 1999.  As discussed below, NAYANDIN helped coordinate many of the shipments

that violated the EAR, including the EAR Russia Sanctions.

29.    BORISENKO is in charge of the day-to-day operations of ELEVIEW's freight

forwarding business.  As discussed below, his responsibilities include coordinating with freight

forwarders about exports, including on the shipments that violated the EAR, including the EAR

Russia Sanctions.

30.    The DEFENDANTS operate a website, https://www.buyusa.ru ("BUYUSA.RU"),

which allows individuals in Russia to order goods from the United States directly from a store in

the United States or through websites like Amazon or eBay.  The DEFENDANTS then consolidate

11

packages from BUYUSA.RU (as well as packages from other sources) before sending packages to the end user.  As explained below, the DEFENDANTS sometimes use other freight forwarders as intermediaries between the DEFENDANTS and the end user.  ELEVIEW receives a fee for consolidating and shipping packages, including those from BUYUSA.RU.   Based on the BUYUSA.RU website, ELEVIEW gets paid a percentage of the cost of the good (a $5 minimum; 10% for goods up to $2,500; 8% for goods over $2,500).  Customers can also pay for additional services, such as pictures of the good ($2) or inspection of the good ($5).

31.   The three export-control evasion schemes through which the DEFENDANTS conspired with each other and others to send controlled goods from the United States to Russia without the required licenses are described below.

## THE TURKEY SCHEME

32.   In the Turkey Scheme, the DEFENDANTS conspired with each other and with others, including employees of RUSSIAN TELECOM CO., to send export-controlled telecommunications equipment from the United States to Russia through front companies and false "ultimate consignees."  According to open-source information, RUSSIAN TELECOM CO. is a major supplier of telecommunications equipment to the Russian government.

## I.   BACKGROUND ON RUSSIAN TELECOM CO.

33.   RUSSIAN TELECOM CO. is a large telecommunications and information technology ("IT") company headquartered in Yekaterinburg, Russia.  According to open-source information, RUSSIAN TELECOM CO. provides services and equipment for the Russian telecommunications sector, including the development, manufacture, and procurement of equipment and IT solutions; system integration and other projects relating to the creation of

telecommunications infrastructure, corporate networks, and data centers; and the creation of professional associations, industry events, and educational programs.

34.    According to open-source information available from the Russian Federal Treasury and the official Russian government contracting website, http://www.clearspending.ru, RUSSIAN TELECOM CO. is a prolific member of the Russian public procurement system.  Over the last decade, RUSSIAN TELECOM CO. has been awarded nearly 300 Russian government contracts for the supply of electronic and telecommunications components, ranging from contracts with local government to Russian federal government entities, including with the FSB, Russia's domestic security agency.

35.    ELEVIEW, NAYANDIN, and RUSSIAN TELECOM CO. have a longstanding business relationship.  According to ELEVIEW's export history, as of 2022, ELEVIEW and RUSSIAN TELECOM CO. had been in business together—with ELEVIEW exporting telecommunications and other goods to RUSSIAN TELECOM CO.—for approximately 15 years. RUSSIAN TELECOM CO. previously maintained an office co-located with ELEVIEW's office in Chantilly, Virginia, and as of on or around June 19, 2022, the name of a joint venture between RUSSIAN TELECOM CO. and NAYANDIN was still visible on the door to ELEVIEW's office.

36.    Prior to the EAR Russia Sanctions, ELEVIEW would declare on export documentation that RUSSIAN TELECOM CO. was the ultimate consignee of the shipments from ELEVIEW to RUSSIAN TELECOM CO.  Indeed, in the year prior to the implementation of the EAR Russia Sanctions (i.e., between February 25, 2021, and February 24, 2022) ELEVIEW exported approximately 83 shipments to RUSSIAN TELECOM CO. and listed RUSSIAN TELECOM CO. as the ultimate consignee on export documentation.  In the year after the implementation of the EAR Russia Sanctions (i.e., between February 25, 2022, and February 24,

2023), ELEVIEW exported one shipment with RUSSIAN TELECOM CO. listed as the ultimate consignee. The investigation has revealed, however, that the DEFENDANTS continued to export goods to RUSSIAN TELECOM CO., but the DEFENDANTS falsely listed a third-party company as the ultimate consignee on export documentation.

37.    At least two employees from RUSSIAN TELECOM CO. were involved in the planning and execution of the Turkey Scheme. First, RUSSIAN TELECOM EMPLOYEE 1 is the Lead Product Manager of Networks Equipment Division in the Product Development Department of RUSSIAN TELECOM CO. Second, RUSSIAN TELECOM EMPLOYEE 2 is the Lead Purchase Manager in the Product Development Department of RUSSIAN TELECOM CO. 1. Both employees list RUSSIAN TELECOM CO.'s address in Ekaterinburg, Russia, in their email signature blocks.

38.    ***The first "Test Shipment."*** In the days and weeks following the imposition of EAR Russia Sanctions on February 23, 2022, the DEFENDANTS communicated with employees from RUSSIAN TELECOM CO. about various potential new routes to send telecommunications equipment to Russia through intermediary countries and front companies.[1]

39.    NAYANDIN and BORISENKO communicated with employees of RUSSIAN TELECOM CO. about how and where to send a "test shipment." The DEFENDANTS exported the first test shipment from the United States to Russia by falsely stating to a freight forwarder that the goods were for an ultimate consignee in Kazakhstan. Internal communications make clear that NAYANDIN and BORISENKO understood the test shipment was bound for Russia and that they

---

[1] The communications between the DEFENDANTS and employees of RUSSIAN TELECOM CO. occur almost exclusively in Russian. The communications are described here in English based on a preliminary translation.

were actively attempting to avoid the EAR Russia Sanctions because, among other evidence: (1) BORISENKO repeatedly requested that the export paperwork remove any reference to RUSSIAN TELECOM CO. because "[RUSSIAN TELECOM CO.] is already associated with Russia, and it is better not to indicate it in documents;" (2) BORISENKO and NAYANDIN discussed how the shipment could not be sent by DHL because, as NAYANDIN explained, "DHL does not work with Russia;" and (3) NAYANDIN worked with an employee of RUSSIAN TELECOM CO. to prepare an "End Use Certificate" (Form BIS-711, which is a form that provides BIS with information on the foreign importer that is receiving technology from the United States and how that importer intends to use the technology) in which NAYANDIN falsely represented that ELEVIEW had been working with the company in Kazakhstan for a year.

40.     The test shipment to Kazakhstan contained four CISCO Switches, which have an ECCN of 5A991.C.  Generally speaking, a "switch" is networking hardware that connects devices on a computer network.  The CISCO switches contained in this shipment were designed for commercial use and, according to ELEVIEW's exportation documents, cost about $270 each.   An ECCN of 5A991.C required a license to export to Russia after the implementation of the EAR Russia Sanctions, but no license was required to export to Kazakhstan.  The DEFENDANTS never obtained a license for these goods.

41.     In April 2022, BIS inspected this shipment prior to it being exported to the purported end user in Kazakhstan.  In an effort to evade the EAR Russia Sanctions, NAYANDIN provided me with the End Use Certificate containing false information about the length of time that ELEVIEW had been working with the company in Kazakhstan.  At the time, I did not know it was false, so the shipment was permitted to be sent to Kazakhstan.

42.     As described below, after this initial test shipment in early 2022, the DEFENDANTS conspired with employees of RUSSIAN TELECOM CO. to illegally export over $1.5 million of telecommunication equipment to Russia through Turkey without the required licenses from BIS.

## II.     THE DEFENDANTS AND EMPLOYEES FROM RUSSIAN TELECOM CO. USED A TURKISH LOCOMOTIVE CO. AS A PASS-THROUGH TO RUSSIA.

### A.  Background on TURKISH LOCOMOTIVE CO.

43.     TURKISH LOCOMOTIVE CO. is based in Istanbul, Turkey.  According to corporate filings in Turkey, TURKISH LOCOMOTIVE CO. was established in May 2017.

44.     One of the original owners of TURKISH LOCOMOTIVE CO. also owns a freight forwarding company based in Istanbul, Turkey ("TURKISH FREIGHT FORWARDER").  On some shipments to TURKISH LOCOMOTIVE CO., the DEFENDANTS listed TURKISH FREIGHT FORWARDER as the point of contact when the shipment arrived in Istanbul.

45.     According to the company's webpage, TURKISH LOCOMOTIVE CO. "offers systems and solutions in areas such as transportation, automotive, energy, iron & steel industries with testing, industrial safety and train technology systems. The company also provides services and solutions in industrial, fire department, search and rescue services, emergency, mining, occupational health and safety areas."

46.     Prior to the EAR Russia Sanctions, the DOC's export documents do not show any shipments from ELEVIEW to TURKISH LOCOMOTIVE CO.  Prior to the EAR Russia Sanctions, the DOC databases show that there were only two shipments at all from U.S.-based companies to TURKISH LOCOMOTIVE CO.  Both were from 2017, and neither was for telecommunications equipment.

47.     Since the implementation of EAR Russia Sanctions, ELEVIEW has exported approximately 25 shipments to TURKISH LOCOMOTIVE CO.   Based on a review of ELEVIEW's records obtained via a court-authorized search warrant, these shipments have all contained telecommunications equipment.

### B. The DEFENDANTS Send Another Test Shipment to TURKISH LOCOMOTIVE CO.

48.     ***NAYANDIN signed a contract with TURKISH LOCOMOTIVE CO.***  On April 15, 2022, RUSSIAN TELECOM EMPLOYEE 2 emailed NAYANDIN with the subject line "Türkiye contract."   Attached to the email, RUSSIAN TELECOM EMPLOYEE 2 sent NAYANDIN a contract between ELEVIEW and TURKISH LOCOMOTIVE CO.  The contract outlined obligations for ELEVIEW to sell unspecified goods to TURKISH LOCOMOTIVE CO. Notably, no one from TURKISH LOCOMOTIVE CO. is included on the email to NAYANDIN regarding this contract.

49.     That same day, NAYANDIN responded to the email and attached an executed version of the contract bearing his name, signature, and a seal for ELEVIEW.

50.     ***BORISENKO sent PB-74270247 to TURKISH LOCOMOTIVE CO.***  On June 6, 2022, BORISENKO emailed export documents for shipment number PB-74270247 to a freight forwarder in New York ("N.Y. FREIGHT FORWARDER").   NAYANDIN was copied on the email.  BORISENKO attached an invoice, a spreadsheet with ECCN information for each product, a Shipper's Letter of Instruction ("SLI") attesting that all statements contained within were true and correct under penalty of law, and a packing list.   All of the documents listed TURKISH LOCOMOTIVE CO. in Istanbul, Turkey, as the ultimate consignee.   The invoice listed 27 line items of telecommunications equipment totaling over $20,000.

17

51.    ***The DEFENDANTS told BIS the shipment was destined for Turkey.***  On June 6, 2022, BORISENKO emailed me with the subject line, "Shipment to Turkey PB-74270247." NAYANDIN was copied on the email.  BORISENKO wrote, "I am preparing a shipment to Turkey.  Can you glance at the documents and give your feedback?  I need your opinion on the docs to prevent any detention. If this shipment gets detained, Eleview will be financially liable for the delay."  BORISENKO attached a file with ECCN numbers for each good, along with a copy of the invoice discussed above.

52.    That same day, I responded to BORISENKO that I was unable to advise him of the correct ECCNs, and asked what his source was for the ECCNs listed in the shipment documents that he had sent.  BORISENKO responded that he was using the CISCO public database.  He wrote, "I can guarantee that ECCN matches the model."

53.    Later on June 6, 2022, NAYANDIN also responded to my email, stating that he applied for classification on SNAP-R.  SNAP-R is system that allows users to submit export license applications, commodity classification requests, reexport license applications, and other requests to the DOC via the Internet.  According to NAYANDIN, the SNAP-R system responded that NAYANDIN should contact CISCO for the ECCN determination on the items.

54.    ***PB-74270247 contained controlled telecommunications equipment.***  On June 7, 2022, BORISENKO emailed an employee of N.Y. FREIGHT FORWARDER that the items were not EAR99, but instead, the shipment was "NLR," meaning "no license required" to Turkey.

55.    Based on my training and experience, I understand that EAR99 means that items are not on the CCL.  In other words, EAR99 means that these items generally do not require a license to export unless they are destined for a prohibited end user or a prohibited end use.  "No License Required" can be used when either: (1) the items being exported are *all* classified as

18

EAR99; or (2) while the items may be on the CCL, no license is required for this specific destination or end user.

56.     For example, in the ECCN data that BORISENKO sent the employee of N.Y. FREIGHT FORWARDER on June 6, 2022, several items are listed as having an ECCN of 5A992.C, 5A991.C, or 5A002.A.   These items are listed on the CCL.   These items required a license for export to Russia, but generally not to Turkey.   The DEFENDANTS did not obtain a license for these products to be sent to Russia.

57.     At BORISENKO's direction, N.Y. FREIGHT FORWARDER sent PB-74270247 to Turkey on June 9, 2022.

**C.  The DEFENDANTS knew that the "Test Shipment" to TURKISH LOCOMOTIVE CO. was transshipped to RUSSIAN TELECOM CO. in Russia.**

58.     Contrary to the representations in BORISENKO's and NAYANDIN's communications to me as described above, the DEFENDANTS knew that PB-74270247 was ultimately destined for RUSSIAN TELECOM CO. in Russia.

59.     ***RUSSIAN TELECOM CO. changed the "end user" to different companies in three different countries.***   First, on March 3, 2022, RUSSIAN TELECOM EMPLOYEE 2 told BORISENKO to pack PB-74270247 as a test shipment to Kazakhstan.   However, as explained above, the DEFENDANTS ultimately sent another test shipment to Russia through Kazakhstan. Then, on April 27, 2022, RUSSIAN TELECOM EMPLOYEE 1 asked NAYANDIN and BORISENKO for a quote for PB-74270247 to be shipped to Uzbekistan instead.   Finally, the DEFENDANTS ultimately shipped the package to Turkey, rather than Kazakhstan or Uzbekistan, on June 9, 2022, as described above.

60.    ***Employees of RUSSIAN TELECOM CO. notified the DEFENDANTS that RUSSIAN TELECOM CO. inspected PB-74270247.***  On June 30, 2022—three weeks after N.Y. FREIGHT FORWARDER shipped PB-74270247 to TURKISH LOCOMOTIVE CO.—a third employee from RUSSIAN TELECOM CO. emailed BORISENKO with the subject line, "PB-74270247 cargo question."   RUSSIAN TELECOM EMPLOYEE 1 and RUSSIAN TELECOM EMPLOYEE 2 were copied on the email.

61.    The metadata associated with this email contains the sender's (i.e., the RUSSIA TELECOM CO. employee's) IP address.  Based on open-source databases, the information associated with that IP address confirms that the email was sent from Russia.  Indeed, employees from RUSSIAN TELECOM CO. used email addresses ending in "@[RUSSIAN TELECOM CO.].ru," indicating that the email addresses were operated by a Russian domain.  Further, the employees' emails often included a signature block, which stated that their address was in Ekaterinburg, Russia.

62.    In the email, the third RUSSIAN TELECOM CO. employee wrote to BORISENKO: "Please tell me, yesterday we had an inspection of this cargo, as a result of the inspection we found these fastenings, we did not see them in the parcel on the website. Were they mistakenly invested? What cargo are they from?"  As shown below, the email included a picture of two metal fasteners laying on a table.  There was no mention of TURKISH LOCOMOTIVE CO. or any employees from said company.



63.     That same day, BORISENKO responded to the email, explaining that the fasteners were from a "mount" that was in the shipment.

### D. Other Evidence that ELEVIEW Shipped Telecommunications Equipment to RUSSIAN TELECOM CO. through TURKISH LOCOMOTIVE CO.

64.     Based on open-source Russian customs and import data, TURKISH LOCOMOTIVE CO. was listed as the "supplier" to RUSSIAN TELECOM CO. for over 400 goods, but none where ELEVIEW was listed as the supplier.  The goods mostly consisted of Cisco equipment and other telecommunications equipment.

65.     A preliminary comparison of this Russian customs data with ELEVIEW's export documents to TURKISH LOCOMOTIVE CO.—filed with the U.S. Government—demonstrates that the goods that ELEVIEW purportedly sold to TURKISH LOCOMOTIVE CO. were transshipped to RUSSIAN TELECOM CO. a few days after they arrived in Turkey.

**E. The DEFENDANTS Filed, or Caused to be Filed, False Documentation Related to Its Shipments of Telecommunications Equipment Through TURKISH LOCOMOTIVE CO.**

66.     I searched for the EEI associated with the shipments to TURKISH LOCOMOTIVE CO. from ELEVIEW, including PB-74270247, and located 25 shipments.

67.     Based on my understanding of how EEI is submitted through AES, either an employee from ELEVIEW submitted the data in the EEI or the DEENDANTS caused N.Y. FREIGHT FORWARDER to submit the information based on the SLI that the DEFENDANTS submitted to N.Y. FREIGHT FORWARDER.

68.     The EEI for each of the 25 shipments from ELEVIEW to TURKISH LOCOMOTIVE CO. shows that the Ultimate Consignee was falsely identified as TURKISH LOCOMOTIVE CO., not RUSSIAN TELECOM CO.

**F. The DEFENDANTS Shipped Nearly $1.5 Million of Telecommunications Equipment to Russia Through TURKISH LOCOMOTIVE CO.**

69.     The DEFENDANTS exported telecommunications equipment to Turkey with TURKISH LOCOMOTIVE CO. as the purported end user until February of 2023, at which time the shipments to TURKISH LOCOMOTIVE CO. appeared to have stopped.

70.     Between the first test shipment in June 2022 and the last identified shipment in February 2023, the DEFENDANTS shipped telecommunications equipment to TURKISH LOCOMOTIVE CO. on 25 separate occasions.

71.     On each shipment, BORISENKO or NAYANDIN was listed as the contact person for ELEVIEW.

72.     In all, the reported value of those 25 shipments totals approximately $1,478,808.00 worth of telecommunications equipment.

73.     Based on my review of documentation associated with many of those shipments, many—if not all—of these shipments contained telecommunications equipment that was subject to the EAR and needed a license for export to Russia, which the DEFENDANTS did not obtain.

74.     Data showing exports between TURKISH LOCOMOTIVE CO. and RUSSIAN TELECOM CO. indicates that TURKISH LOCOMOTIVE CO. was merely transshipping—with the DEFENDANTS' knowledge—the telecommunications equipment to RUSSIAN TELECOM CO.

75.     For the reasons described above, there is probable cause to believe that the DEFENDANTS exported each of these shipments to TURKISH LOCOMOTIVE CO. knowing that they would be transshipped to RUSSIAN TELECOM CO. in Russia without a license.  In addition, TURKISH LOCOMOTIVE CO. holds itself out to be a locomotive equipment company, not telecommunication equipment company.  Based on my training and experience, the amount of telecommunications equipment that the DEFENDANTS purportedly sent to TURKISH LOCOMOTIVE CO. is far greater than one locomotive equipment company would need, which indicates that the telecommunications equipment was not intended for TURKISH LOCOMOTIVE CO.

## THE FINLAND SCHEME

76.     Prior to the EAR Russia Sanctions, as part of ELEVIEW's business related to its BUYUSA.RU website, ELEVIEW regularly exported goods to Russia using various freight forwarders (both within the United States and abroad), and the DEFENDANTS listed Russia as the country of ultimate destination.  After the EAR Russia Sanctions, the DEFENDANTS generally stopped listing Russia as the ultimate destination and began falsely listing a freight forwarder in Finland as the "ultimate consignee" of the goods from BUYUSA.RU.  The

DEFENDANTS knew that these goods were not destined for Finland and would be transshipped to Russia by the Russian postal service.  In total, between March 2022 and June 2023, the DEFENDANTS exported 82 shipments of goods from the United States to Russia through Finland, totaling over $3.4 million worth of goods, including goods that required a BIS license to export to Russia.

I.   **THE DEFENDANTS PROMPTLY BEGIN TO VIOLATE THE EAR RUSSIA SANCTIONS BY MISREPRESENTING THE ULTIMATE CONSIGNEE.**

77.   On March 11, 2022, over two weeks after the implementation of the EAR Russia Sanctions, BORISENKO sent an email to a freight forwarder in Maryland ("MARYLAND FREIGHT FORWARDER").  NAYANDIN was cc'd on the email.  The email subject was "FINLAND beusa-80924103."  The number "beusa-80924103" is ELEVIEW's reference number for the shipment.

A.   **BORISENKO Falsely Told MARYLAND FREIGHT FORWARDER that the Shipment Would Not be Transshipped to Russia.**

78.   In the email on March 11, 2022, BORISENKO requested a shipping quote for several pallets going to Finland.  An employee of MARYLAND FREIGHT FORWARDER responded, "As discussed, we can only handle materials to Finland if the final destination is Finland, [and] if these materials will NO[T] be transshipped to Russia.  Please fill out the attached … [Shipper's Letter of Instruction] form stating that."

79.   As shown below, BORISENKO responded to the employee: "This shipment is for Finland ONLY, and will not be transported to Russia."



80.     That same day, BORISENKO sent MARYLAND FREIGHT FORWARDER the SLI, which was signed by NAYANDIN and dated March 11, 2022.

81.     NAYANDIN listed FINNISH FREIGHT FORWARDER, a freight forwarding company in Finland, and ELEVIEW as the "Ultimate Consignees."   The address of FINNISH FREIGHT FORWARDER was listed as the ultimate consignee.   The description of the goods was listed as "COURIER MATERIALS," and the SLI also included the same shipper's reference number from the email—beusa-80924103.

**B. The DEFENDANTS Told Companies in Finland and Russia to Transship the Packages to Russia.**

82.     Only hours after BORISENKO told MARYLAND FREIGHT FORWARDER that the shipment will "not be transported to Russa," BORISENKO emailed employees from FINNISH

25

FREIGHT FORWARDER and Russia Post, which is the national mail company of Russia. NAYANDIN was cc'd on the email.  In that email, BORISENKO referred to the same reference number (beusa-80924103) and attached several documents, including a spreadsheet titled "Manifest_beusa-80924103" (the "Manifest").

83.    As excerpted below, the Manifest included over two hundred entries, each of which provided details about the goods within beusa-80924103, including the recipient's name, address, a description of the goods they purchased, and a tracking number.  The recipients included dozens of individuals with addresses in Russia, including in Moscow, Yekaterinburg, St. Petersburg, and Ryazan.  And, as discussed below, the tracking number was consistent with the syntax of tracking numbers used by the Russia Post to deliver packages inside of Russia.

84.    Four days after the initial email to FINNISH FREIGHT FORWARDER and Russia Post, NAYANDIN emailed the same individuals.  NAYANDIN stated, "Hello colleagues.  This cargo arrived yesterday.  You need to print documents on it.  Your barcodes are on every box.  All okay?"

85.    Based on my training and experience and the other evidence described below, I believe that NAYANDIN was instructing employees from FINNISH FREIGHT FORWARDER and Russia Post to scan barcodes with Russia Post tracking numbers that ELEVIEW employees put on individual packages so that FINNISH FREIGHT FORWARDER and Russia Post could attach complete shipping labels on the packages for the ultimate recipients in Russia.  Russia Post could then ship these packages to the ultimate recipients.

**C.  An Inspection of Exports from ELEVIEW Confirms the Finland Scheme.**

86.     Nearly nine months after the DEFENDANTS began using Finland to transship items to Russia, on December 5, 2022, BORISENKO emailed employees from N.Y. FREIGHT FORWARDER about twelve pallets purportedly bound for Finland.

87.     On December 7, 2022, BORISENKO emailed employees from N.Y. FREIGHT FORWARDER documents related to this shipment.  Attached to the email was an SLI, an Excel document with the HTS codes for the goods within the shipment, and an invoice for the goods.

88.     The SLI listed FINNISH FREIGHT FORWARDER / ELEVIEW as the ultimate consignee.  It also noted that the shipment was "NLR" or "no license required," signifying that ELEVIEW did not require a license to export the goods.  The invoice similarly listed FINNISH FREIGHT FORWARDER as the ultimate consignee.

89.     In early December 2022, U.S. Customs and Border Protection ("CBP") detained a shipment at the JFK International Airport in Queens, New York, at the request of HSI working in conjunction with BIS.  The shipment included 12 pallets that had been shipped from ELEVIEW to FINNISH FREIGHT FORWARDER.  According to the electronic export information this shipment was supposed to be exported from JFK International Airport on December 9, 2022.

90.     ***ELEVIEW's Pallets***.  HSI observed that each pallet was on plastic pallet base and the contents were contained within a large cardboard outer shell.  Once the shells were removed, the team found that the pallets were comprised of hundreds of smaller shipping boxes.  Many of these boxes bore the name of their eCommerce origin such as Amazon, eBay, Walmart, Newegg, and others.  Many of these smaller boxes inside the pallets had shipping labels addressed to NAYANDIN at ELEVIEW's facility in the Eastern District of Virginia, indicating they were likely received at the ELEVIEW facility before being repackaged and reshipped.

91.    The picture below shows examples of the DEFENDANTS' pallets containing a large cardboard outer shell.



92.    ***Each Pallet Contained Individual, Labeled Boxes with Russia Post Tracking Numbers.***   During the inspection, most of the smaller boxes contained within the pallets had matching white adhesive labels affixed to their exterior.   These printed labels did not appear to come from the company of origin (eBay, Amazon, etc.) and appeared to have been placed prior to being packaged in the pallet.   Each sticker possessed a scannable barcode and a 13-digit number labeled "Tracking number."   Each tracking number started with two letters, a series of numbers, and ended with "RU."   The following is an example of the adhesive with the Tracking Number on one of the packages.



93.     These tracking numbers are also consistent with the Manifest, discussed above, which listed the ultimate recipients of various packages in Russia and the associated tracking number. The tracking numbers in the Manifest also ended with an "RU."

94.     These labels are also consistent with the DEFENDANTS' prior communications with FINNISH FREIGHT FORWARDER and Russia Post, regarding the need for those companies to scan the barcodes on boxes from the DEFENDANTS.

**D. The DEFENDANTS Filed, or Caused to be Filed, False Statements in the Electronic Export Information Associated with This Shipment.**

95.     I searched for the EEI associated with the above-described shipment.  The EEI noted that the Ultimate Consignee was FINNISH FREIGHT FORWARDER.  Based on my understanding of how EEI is submitted through AES, either an employee from ELEVIEW submitted the data in the EEI or the DEENDANTS caused MARYLAND FREIGHT

FORWARDER to submit the information based on the SLI that the DEFENDANTS submitted to MARYLAND FREIGHT FORWARDER.

96.     Based on the evidence in the Manifest, the information on the EEI related to this shipment is false because the ultimate consignee was not FINNISH FREIGHT FORWARDER, but rather the individuals listed in the Manifest who reside in Russia.

97.     Moreover, based on my understanding of how ELEVIEW's business works, it would not make sense that a freight forwarder—such as FINNISH FREIGHT FORWARDER—would be the ultimate consignee because freight forwarders are not in the business of purchasing or reselling goods; they merely forward the goods to their next destination.

## II.     THE DEFENDANTS EXPORTED CONTROLLED GOODS TO RUSSIA USING THE FINLAND SCHEME.

### A.  ELEVIEW's Export Documents Confirm That Many Shipments Contained High-Priority Controlled Goods.

98.     As described above, BIS has identified certain "high priority" goods that are particularly helpful to the Russian war effort.  BIS has grouped these high priority goods according to the HTS codes, which, as explained above, is a number used to help classify the type of good and the applicable regulations or restrictions for the export of that good.

99.     As part of its export documentation, the DEFENDANTS were required to list the HTS codes for the goods in each shipment.   In most of the paperwork, however, the DEFENDANTS merely put one or a handful of HTS code for all of the goods.  More importantly, because the purported ultimate destination for these shipments was Finland, the HTS codes did not draw as much scrutiny as they would have if the export documentation said (correctly) that the goods were bound for Russia.

100.   Because the DEFENDANTS falsely claimed that the shipments to Finland were intended to stay in Finland, the shipments of items with these HTS codes were permitted to be exported to Finland.  But this investigation has revealed that these goods were actually intended for Russia, which was prohibited without the required license (which the DEFENDANTS did not obtain) under the EAR Russia Sanctions.

101.   ELEVIEW's export documentation confirms that many of their shipments to Finland contained high priority goods subject to the EAR Russia Sanctions.  The following paragraphs provide some examples.

102.   ***Tier 1 High Priority Items.***  BIS's "Tier 1" items are of the highest concern due to their critical role in the production of advanced Russian precision-guided weapons systems, Russia's lack of domestic production, and limited global manufacturers.

103.   ELEVIEW's export documentation reveals that the DEFENDANTS exported eight shipments to Russia through the Finland Scheme that listed Tier 1 HTS code 8542.32 (covering electronic integrated circuits) that required a license for export to Russia.  A manifest from that shipment listed the export as "ELECTRONICS/Hard drive" valued at over $4,000.  Some of these shipments list multiple items as having a HTS code 8542.32, including a hard drive valued at over $4,000.

104.   ***Tier 2 High Priority Items.***  BIS's "Tier 2" items are additional electronics items for which Russia may have some domestic production capability but prefers to source from the United States and its partners and allies.

105.   ELEVIEW's export documentation reveals that the DEFENDANTS exported one shipment to Russia through the Finland Scheme that listed Tier 2 HTS code 8517.62 (covering machines for the reception, conversion and transmission or regeneration of voice, images, or other

data, including switching and routing apparatus) and two shipments to Russia through the Finland Scheme that listed Tier 2 HTS code 8526.91 (covering radio apparatus, radio navigational aid apparatus and radio remote control apparatus: radio navigational aid apparatus).

106.   For each of these shipments with Tier 1 and Tier 2 high-priority items, BORISENKO and NAYANDIN coordinated exportation with the U.S.-based freight forwarder (to whom they provided false information about the ultimate consignee) and notified the Russia Post and FINNISH FREIGHT FORWARDER about the incoming shipments.  NAYANDIN is listed as the company representative on and/or signed the SLI, which falsely listed Finland as the location of the ultimate consignee.

### B.   The DEFENDANTS Shipped to Russia a Type of Ethernet Transceiver That Has Been Used in Russian "Suicide" Drones.

107.   ELEVIEW's internal documents demonstrate that following the implementation of the EAR Russia Sanctions on February 24, 2022, NAYANDIN was purchasing thousands of dollars' worth of sensitive technology from U.S.-based distributors for exportation to Russia.  This technology included microcircuits, graphics cards, capacitors, and microchips that had HTS codes listed on BIS's "Top Tier" high-priority items.

108.   For example, based on ELEVIEW's BUYUSA.RU database, I was able to track the purchase and export of an Ethernet transceiver produced by a U.S.-based manufacturer.  The Ethernet transceiver has an HTS code of 8542.39, which BIS has classified as a Tier 1 high priority item because of its critical role in the production of advanced Russian precision-guided weapons systems.  Exportation of this Ethernet transceiver from the United States to Russia required a license.

109.    This exact type of Ethernet transceiver has been found on the battlefield in Ukraine as part of a Russian "suicide drone" called the "Lancet."   Russia's Lancets are strapped with explosives and loiter around an area until the pilot identifies a target.   The pilot then flies the Lancet into the target, detonating the explosives.   Open-source reporting explains that Lancet has been used by Russian forces to destroy some of Ukraine's most valuable military equipment, including tanks and jets.

110.    The BUYRUSA.RU database shows that the end user of the Ethernet transceiver was in Russia.   The database also shows a Russia Post tracking number associated with this order. Publicly available data for the Russia Post tracking number associated with the Ethernet transceiver confirmed that it arrived in Finland on or about July 28, 2022 and arrived to its end-user in Russia on or about August 4, 2022.

111.    ELEVIEW's export documentation confirms that the DEFENDANTS coordinated several shipments to Russia through the Finland Scheme between on or about July 8, 2022, and on or about July 28, 2022.   In each of these shipments, BORISENKO and NAYANDIN coordinated the export with the U.S.-based freight forwarder.   BORISENKO and NAYANDIN provided the U.S.-based freight forwarder with false information that the ultimate consignee was in Finland. As soon as BORISENKO received the final export documentation from the freight forwarder, he emailed employees at Russia Post and FINNISH FREIGHT FORWARDER to notify them that the shipment was being exported.

**C. NAYANDIN Purchased Controlled, High-Priority Goods to be exported to Russia.**

112. ***NAYANDIN purchased high-priority items from U.S.-based distributor.*** On August 9, 2022, NAYANDIN purchased over $700 worth of high-priority goods from a U.S. distributor.

113. Eleven of the 17 items purchased had HTS codes which were designated as "Tier 1" items on the Common High Priority Items List, which, according to BIS, were of highest concern due to their critical role in the production of advanced Russian precision guided weapons systems, Russia's lack of domestic production, and limited global manufacturers.

114. Two of the items purchased by NAYANDIN fell under "Tier 2" of the Common High Priority Items List, which according to BIS are items for which Russia may have some domestic capability but a preference to source from the United States and its partners or allies.

115. Two of the items were designated as "Tier 3," which are described as a broader range of electronic items, as well as navigation and camera components, that Russia has sourced from foreign companies.

116. All but one of the items purchased in this order required a license to be shipped to Russia because of the HTS code or ECCN assigned to them.

117. ***Some of the high-priority items are advertised for military use.*** I searched the part numbers contained on the purchase order using the various manufacturers websites to find technical specifications for these goods. Several of these goods were advertised by the manufacturers as suitable for military equipment or systems.

118. For example, a search of U.S. COMPANY 1's website for a specific part number purchased by NAYANDIN revealed that U.S. COMPANY 1 advertises this part as a low noise

amplifier that can be used for "military radar" and "military communications." I obtained a license determination on this part number with HTS code 854239, and according to the license determination, this item required a license requirement for the export, reexport, or transfer to Russia.

119.   As another example, I searched U.S. COMPANY 2's website for a directional coupler with a specific part number purchased by NAYANDIN. The U.S. COMPANY 2 datasheet for this product stated that this product is advertised for use in military defense systems. According to the license determination I obtained on this specific part number, this directional coupler is "classified under ECCN 3A611.x (Military Electronics)" and required a license for export to Russia.

120.   I also reviewed the DOC's database and discovered that the DEFENDANTS never obtained a license for any of the goods in this shipment that required a license for export to Russia.

121.   ***BORISENKO exported these high-priority items to Russia***. The BUYRUSA.RU database shows that the end use of these high-priority items was in Russia. The database also shows a Russia Post tracking number associated with this order. Publicly available data for the Russia Post tracking number associated with these high-priority items shows that it arrived in Finland on or about September 5, 2022, and arrived to its end-user in Russia on or about September 12, 2022.

122.   On August 29, 2022, BORISENKO communicated with the N.Y. FREIGHT FORWARDER to coordinate a shipment of seven pallets of goods to Finland. The N.Y. FREIGHT FORWARD assigned shipment reference number S200356 to this shipment. Based on the timing, country of destination, and export documentation of this shipment, I submit there is

probable cause to believe that shipment number S200356 included the order for these high-priority items.

123.   On or about August 31, 2022, BORISENKO sent N.Y. FREIGHT FORWARDER export documentation, including an unsigned[2] SLI and invoice.  Both the SLI and invoice listed FINNISH FREIGHT FORWARDER as ultimate consignee, and the SLI listed Finland as the country of ultimate destination.

124.   On or about September 3, 2022, BORISENKO emailed employees of Russia Post and FINNISH FREIGHT FORWARDER regarding the incoming shipment.  As mentioned above, publicly available tracking data for this order shows that the high-priority items were delivered to Finland on or about September 5, 2022, and to the end-user in Russia on or about September 12, 2022.

125.   I searched for the EEI associated with the shipment of S200356.   The EEI associated with S200356 stated that the ultimate consignee was the FINNISH FREIGHT FORWARDER, not the true ultimate consignee in Russia.  The EEI also stated that the country of ultimate destination was Finland, not the true ultimate destination, Russia.

## III.   THE DEFENDANTS SMUGGLED OVER $3.4 MILLION OF GOODS TO RUSSIA THROUGH THE FINLAND SCHEME.

126.   Between the first shipment in March 2022 and June 2023, the DEFENDANTS exported approximately 81 shipments of goods from the United States to Russia through Finland.

127.   On each shipment, BORISENKO or NAYANDIN was listed as the contact person for ELEVIEW.

---

[2] Unlike other SLI, NAYANDIN's signature does not appear on this SLI.   A review of ELEVIEW's records has not revealed a signed version of this SLI.

128.   In all, the reported value of those 82 shipments totals approximately $3,450,772.00 worth of goods.

129.   Based on my review of documentation associated with a sample of those shipments, some of those shipments contained goods that required a license from BIS for export to Russia, which the DEFENDANTS did not obtain.

130.   For the reasons described above, there is probable cause to believe that the DEFENDANTS exported each of these shipments to FINNISH FREIGHT FORWARDER knowing that they would be transshipped to Russia in violation of the EAR, including the EAR Russia Sanctions.

## IV.   THE DEFENDANTS RETURNED TO SHIPPING GOODS DIRECTLY TO RUSSIA AFTER FEDERAL LAW ENFORCEMENT EXECUTED A SEARCH WARRANT FOR ELEVIEW'S WAREHOUSE.

131.   As described in more detail below, on June 21, 2023, federal law enforcement executed a warrant to search ELEVIEW's warehouse in Chantilly, Virginia.

132.   After federal law enforcement executed the search warrant, ELEVIEW ceased listing FINNISH FREIGHT FORWARDER as the ultimate consignee.  Instead, ELEVIEW now has been listing the purported end users in Russia as the ultimate consignee.  It also appears that ELEVIEW has limited the types of goods it is exporting to include only goods that do not require a license to go to Russia.  After the execution of the search warrant, many of  ELEVIEW's exportation documents claimed that, to the extent a shipment contained controlled goods, the shipment fell into an exception for a license known as the "Consumer Communications Devices Exception," which permitted exportation of controlled communication devices, such as cell phones and laptops, provided that the device was for induvial, non-governmental users.

37

133.    Based on my training and experience, as well as the evidence described above, I believe that the DEFENDANTS shipped most of the goods purchased through ELEVIEW's BUYUSA.RU website to Russia both before and after the imposition of the EAR Russia Sanctions. But following the imposition of the EAR Russia Sanctions, between March 2022 and June 2023, the DEFENDANTS provided false information about the ultimate consignee of those shipments by listing FINNISH FREIGHT FORWARDER as the ultimate consignee.

## THE KAZAKHSTAN SCHEME

134.    In the Kazakhstan Scheme, the DEFENDANTS provided false information to the MARYLAND FREIGHT FORWARDER that the goods that ELEVIEW was exporting were bound for an end user in Kazakhstan.  ELEVIEW's internal database, which was obtained through a court-authorized search warrant, however, shows that these orders were bound for end users within Russia.

**I.       BACKGROUND ON THE KAZAKH SHIPPING SERVICE.**

135.    Both before and after the implementation of the EAR Russia Sanctions, ELEVIEW used a Kazakhstan-based shipping company ("KAZAKH SHIPPING SERVICE") to ship goods from the United States to Russia.

136.    The KAZAKH SHIPPING SERVICE holds itself out to be an international shipping and logistics company based in Kazakhstan.  The KAZAKH SHIPPING SERVICE offers several services, including shipping domestically (within Kazakhstan) and internationally, and support and logistics for online shops by providing sorting, labeling, and processing capabilities. The KAZAKH SHIPPING SERVICE advertises that it can deliver goods within Kazakhstan and any of the countries in the "Commonwealth of Independent States," which includes Russia.

II.   **THE DEFENDANTS TOLD U.S.-BASED FREIGHT FORWARDERS THAT SHIPMENTS TO THE KAZAKH SHIPPING SERVICE WERE FOR END USERS IN KAZAKHSTAN.**

137.   The DEFENDANTS used the MARYLAND FREIGHT FORWARDER and the N.Y. FREIGHT FORWARDER to coordinate shipments from ELEVIEW to end users in Russia through the KAZAKH SHIPPING SERVICE.

138.   Export records between ELEVIEW and the KAZAKH SHIPPING SERVICE show that ELEVIEW sent 52 shipments to the KAZAKH SHIPPING SERVICE through MARYLAND FREIGHT FORWARDER and N.Y. FREIGHT FORWARDER between March 2022 (after the implantation of the EAR Russia Sanctions) and June 2023.  Either NAYANDIN or BORISENKO was listed as the point of contact for each shipment.

139.   A review of export records, as well as communications between the DEFENDANTS and the U.S.-based freight forwarding companies, demonstrates that the DEFENDANTS falsely told the freight forwarders that the KAZAKH SHIPPING SERVICE was the end user for the shipments.

140.   The SLI for the shipments to the KAZAKH SHIPPING SERVICE falsely stated that the ultimate consignee of these shipments was the KAZAKH SHIPPING SERVICE.

141.   The following provides an example of how the DEFENDANTS coordinated the shipment of a controlled item from the United States to Russia through the Kazakhstan Scheme.

A.   **The DEFENDANTS exported a controlled oscilloscope to Russia through the Kazakhstan Scheme.**

142.   On or about June 2, 2022, BORISENKO emailed employees of N.Y. FREIGHT FORWARDER about a shipment with reference number BEKZ-32427938.  BORISENKO's email indicated that the shipment was bound for Kazakhstan.

143.   On or about June 7, 2022, BORISENKO emailed employees of N.Y. FREIGHT FORWARDER, stating that he wanted them to ship BEKZ-32427938 and attaching several export documents.   The attached SLI listed Kazakhstan as the country of ultimate destination and KAZAKH SHIPPING SERVICE as the ultimate consignee.  The SLI was signed by NAYANDIN.

144.   On or about June 12, 2022, BORISENKO confirmed with N.Y. FREIGHT FORWARDER that he wanted N.Y. FREIGHT FORWARDER to export BEKZ-32427938.

145.   On or about June 13, 2022, BORISENKO emailed an individual with the subject line BEKZ-32427938.  Notably, the recipient NAYANDIN is copied on the email. The email included two attachments: a final airway bill and a spreadsheet.

146.   The spreadsheet attached to the June 13, 2022 email includes a list of accounts, the items associated with that account, and the price and quantity of the goods.  Each order has an associated "PB-number."

147.   Included in this spreadsheet is an order for an oscilloscope, which is used to assemble, debug, and maintain electronic equipment.  The oscilloscope has an associated PB-number of PB-50438989.

148.   I reviewed ELEVIEW's internal database for information associated with PB-50438989.  The database confirmed that the end-user of this oscilloscope was in Moscow, Russia.

149.   The oscilloscope had an ECCN of 3A992.A, which required a license to export to Russia.  The DEFENDANTS never obtained a license to export this oscilloscope.

150.   I searched for the EEI associated with the shipment BEKZ-32427938.  The EEI falsely stated that Kazakhstan was the country of ultimate destination and that KAZAKH SHIPPING SERVICE was the ultimate consignee.

40

## V.   THE DEFENDANTS SMUGGLED APPROXIMATELY $1.4 MILLION OF GOODS TO RUSSIA THROUGH THE KAZAKHSTAN SCHEME.

151.   Between the first shipment in March 2022 and June 2023, the DEFENDANTS smuggled approximately 54 shipments of goods from the United States to Russia through Kazakhstan.

152.   On each shipment, BORISENKO or NAYANDIN was listed as the contact person for ELEVIEW.

153.   In all, the reported value of those 54 shipments totals approximately $1,468,816.00 worth of goods.

154.   Based on my review of documentation associated with a sample of those shipments, some of those shipments contained goods that were export controlled and required a license from BIS for export to Russia, which the DEFENDANTS did not obtain.

155.   For the reasons described above, there is probable cause to believe that the DEFENDANTS exported each of these shipments to KAZAKH SHIPPING SERVICE knowing that they would be transshipped to Russia in violation of the EAR, including the EAR Russia Sanctions.

### THE DEFENDANTS ARE SOPHISTICATED EXPORTERS WITH KNOWLEDGE OF EXPORT CONTROL LAWS

### I.   INITIAL BIS OUTREACH AND DEFENDANTS' PRE-RUSSIA SANCTIONS EXPERIENCE WITH U.S. EXPORT LAWS.

156.   After the implementation of the EAR Russia Sanctions, on March 30, 2022, an OEE Special Agent and I went to ELEVIEW and spoke with the NAYANDIN, BORISENKO, and a third ELEVIEW employee ("ELEVIEW EMPLOYEE 1") regarding ELEVIEW's and its employees' practices under the EAR Russia Sanctions.

157.    NAYANDIN stated that most packages consolidated by the company were sent to Russia, and, as a result of the EAR Russia Sanctions, their business had been hurting.  Both NAYANDIN and BORISENKO indicated that the company was still trying to figure out how to handle the situation since most freight forwarders refused to ship any shipments to Russia due to the sanctions.

158.    NAYANDIN stated that ELEVIEW was visited by another federal agency[3] five years earlier which provided the company with export control information.  During that outreach, the BIS agents provided ELEVIEW with an outreach packet containing information about export laws and went over the consolidated screening lists, current trade embargoes, and the restrictions on Russian exports.

159.    NAYANDIN indicated that he, BORISENKO, and ELEVIEW EMPLOYEE 1 also took part in a DHL webinar on export rules and regulations.  NAYANDIN did not recall when the DHL webinar took place.  NAYANDIN stated that he, BORISENKO, and ELEVIEW EMPLOYEE 1 had a good knowledge of U.S. export controls, as well as the current Russia Sanctions.

160.    NAYANDIN, BORISENKO, and ELEVIEW EMPLOYEE 1 stated they had a firm understanding of ECCNs as well as the CCL.  NAYANDIN also said that he, BORISENKO, and ELEVIEW EMPLOYEE 1 were familiar with SNAP-R, which is discussed above.

161.    During the March 2022 outreach, I asked NAYANDIN, BORISENKO, and ELEVIEW EMPLOYEE 1 if they were familiar with EAR Russia Sanctions. NAYANDIN replied that they had been exporting a long time and had intimate knowledge of the export laws and

---

[3] A DOC-BIS database query revealed that BIS agents visited ELEVIEW on January 31, 2018.

regulations. NAYANDIN also indicated that management from ELEVIEW knew about EAR Russia Sanctions and that they knew that they could not ship items that had an ECCN to Russia at that point.

162. BORISENKO stated that all of the items that they ship were EAR99 goods. EAR99 goods generally do not require a license to be exported to Russia. I told them that most items that have an ECCN assigned to them could not go to Russia at that point without a license. I informed them that if they had any doubt rather an item could be sent to Russia without a license that they needed to sign on to SNAP-R and request a license for that specific item. I informed NAYANDIN, BORISENKO, and ELEVIEW EMPLOYEE 1 that the SNAP-R system could also be used to figure out if an item has an ECCN assigned to it or not.

163. NAYANDIN said that they knew what they could and could not send to Russia at that time in light of the EAR Russia Sanctions. I advised NAYANDIN, BORISENKO, and ELEVIEW EMPLOYEE 1 that it was important to check BIS's website for the latest changes to the EAR Russia Sanctions.

164. I provided a physical outreach packet to NAYANDIN, BORISENKO, and ELEVIEW EMPLOYEE 1 that included the following documents: Red Flags of Export Violations, Recognizing and Reporting Violations, Know Your Customer, Consolidated Screening List, Export Control Overview, and Criminal and Administrative Penalties.

165. On March 30, 2022, I followed up with an email to BORISENKO and NAYANDIN, which attached .pdf files of the same materials I included in the outreach packet. The body of the email sent to ELEVIEW included hyperlinks to the BIS website and a link to the exporter portal, a site dedicated to helping individuals that export to do so legally. The email also included my contact information for any questions that ELEVIEW had on exports in the future.

166.   Despite their knowledge of the EAR Russia Sanctions and associated requirements for sending goods to Russia, the DEFENDANTS continued to operate ELEVIEW as a business that knowingly exported controlled items to Russia (or to a third country with the ultimate end-user in Russia) without the required licenses.

## II.    SECOND BIS OUTREACH.

167.   On November 2, 2022, an OEE Special Agent and I conducted another outreach at ELEVIEW's warehouse concerning the EAR Russia Sanctions and the DEFENDANTS' compliance issues therewith.

168.   BORISENKO attended the meeting on behalf of ELEVIEW management. NAYANDIN and ELEVIEW EMPLOYEE 1 did not attend.

169.   During the interview, BIS asked BORISENKO if BUYUSA.RU was a website owned and operated by ELEVIEW.  BORISENKO stated that ELEVIEW owned and operated BUYUSA.RU, which allowed individuals in Russia to order goods from the United States and ship them to a country not subject to U.S. sanctions.

170.   BORISENKO stated that ELEVIEW's business model was such that customers bought items from BUYUSA.RU and then the items were shipped to ELEVIEW where numerous orders were consolidated and repackaged and exported to the end destination.  BORISENKO further stated that ELEVIEW was not a manufacturer of goods, nor did they produce any goods; they only consolidated goods from other businesses to be exported.

171.   A search using https://who.is, an internet domain query tool, revealed that the managing organization for BUYUSA.RU is ELEVIEW.  The search also showed that the website was created on July 27, 2008, and is paid for by ELEVIEW through July 27, 2024.

172.   BORISENKO further stated that many of the goods ELEVIEW consolidated and shipped end up in Russia.  When asked if they reviewed who was buying the goods from their website, BORISENKO stated that ELEVIEW tried to verify purchasers, but the procedures were at times unsuccessful.  He further admitted that ELEVIEW re-packaged goods that were bought from BUYUSA.RU.  Many of these re-packaged goods were sent to the FINNISH FREIGHT FORWARDER.

173.   BORISENKO originally described the FINNISH FREIGHT FORWARDER as a re-seller of goods, but, when pressed with the fact that the FINNISH FREIGHT FORWARDER's website describes the company only as a freight forwarder, BORISENKO admitted to knowing that the ultimate consignee was the person placing the order in Russia and not the freight forwarder in Finland.

174.   On October 31, 2022, I sent BORISENKO an email containing 15 C.F.R § 740.19 Consumer Communications Devices.  This document contained a list of goods that could be sent to Russia without a license.  BORISENKO was also given a hard copy of this document during the outreach.  I went over this document at length during the outreach event.  During the outreach event, I also provided BORISENKO a copy of 15 C.F.R. § 746 (concerning embargoes and other special controls on various countries, including Russia) and 15 C.F.R. § 744 (concerning end-users) which contained the most up-to-date material on EAR Russia Sanctions.  During the meeting, BORISENKO was provided a physical outreach packet containing the same documents that I provided during the first BIS outreach on March 30, 2022.

175. A subsequent review of email communications that include NAYANDIN, BORISENKO, ELEVIEW EMPLOYEE 1, and others, indicates that the DEFENDANTS did take some measures to avoid certain violations of EAR Russia Sanctions.  For example, there are

45

communications about: whether the DEFENDANTS should prohibit certain users from using BUYUSA.RU because the customer was providing false information about the goods they purchased; ELEVIEW's internal controls for stopping certain prohibited items from being sent to Russia; and BORISENKO and NAYANDIN's communications with customers about the need for the DEFENDANTS to abide by the EAR Russia Sanctions.  The DEFENDANTS also obtained an export classification request (i.e., a determination as to the specific ECCN for a product) for one specific type of Cisco switch, which showed that it was classified under ECCN 5A991.

176.   Despite these communications, the evidence in this case demonstrates that the DEFENDANTS chose to willfully violate and evade the EAR, including the EAR Russia Sanctions on multiple occasions and in multiple ways, despite their knowledge and understanding of the export regulations.

### III.     PREMISES SEARCH WARRANT FOR ELEVIEW'S WAREHOUSE.

177.   On June 16, 2023, this Court issued a search warrant for a search and seizure of evidence in ELEVIEW's warehouse in Chantilly, Virginia.   A team of agents from BIS and HSI executed the search warrant on June 21, 2023.

178.   After entering and securing the warehouse, agents spoke to ELEVIEW EMPLOYEE 1 outside of the business to explain what was happening. During that explanation, ELEVIEW EMPLOYEE 1 stated something to the effect of, "I suspected this would happen. I knew we were under investigation."

179.   Later in the day, as agents were finishing up the search warrant, ELEVIEW EMPLOYEE 1 told agents something to the effect of, "A lot of this stuff can't be shipped. We were just storing it."  Based upon the totality of the circumstances, I believe that ELEVIEW EMPLOYEE 1 was trying to explain that various items stored in the warehouse were controlled

for export and, by implication, were unable to be shipped to Russia without a license.  But based on the investigation to date, including evidence that ELEVIEW has sent controlled items to Russia and evidence found during the execution of the search warrant, I believe ELEVIEW EMPLOYEE 1 was not being truthful to the extent he was suggesting that he and others at ELEVIEW were "just storing" the controlled goods.

180.   On a computer in the main office of the warehouse, which was logged into BORISENKO's ELEVIEW email account using the Google Chrome browser, the Adobe Acrobat program was active in the task bar. The open PDF document in Adobe was the BIS document titled "Implementation of Additional Sanctions Against Russia and Belarus Under the Export Administration Regulations (EAR) and Refinements to Existing Controls" and dated May 23, 2023.  That document contains the specific regulations governing EAR Russia Sanctions that, based on the investigation, I believe the DEFENDANTS were violating.  The top of the document contained a hyperlink to the Federal Register website to which the regulations were published, and the link was highlighted indicating that someone likely copied it for pasting into a web browser or email.

## **CONCLUSION**

181.    Based on the foregoing, I submit that there is probable cause to believe that between approximately February 26, 2022, through and including at least June 2022, in Chantilly, Virginia, within the Eastern District of Virginia, and elsewhere, ELEVIEW, NAYANDIN, and BORISENKO, violated 50 U.S.C. §§ 4819(a)(2)(B), (D), (F), and (G), by conspiring with one another to violate ECRA and the EAR, including the EAR Russia Sanctions, and by performing various acts, described above, to violate those laws.

Respectfully submitted,

CHRISTOPHER SILVA   Digitally signed by
CHRISTOPHER SILVA
Date: 2024.10.31 14:20:27 -04'00'

Christopher Silva
Special Agent
U.S. Department of Commerce
Office of Export Enforcement

Submitted by reliable electronic means, sworn to and signature attested as per Fed. Rules Cr. Proc. 4.1, on November 1, 2024.

Hon. William B. Porter
UNITED STATES MAGISTRATE JUDGE